UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| NANCY BULLARD, et al.,       ) | |
|                      ) | |
|     Plaintiffs,         ) | |
| v.                           ) | No. 3:06-1162 |
|                      ) | JUDGE ECHOLS |
| FORT CAMPBELL FEDERAL    ) | |
| CREDIT UNION,           ) | |
|                      ) | |
|     Defendant.        ) | |

## MEMORANDUM

Pending before the Court are Defendant's Motion For Summary Judgment As To Plaintiff Nancy Bullard's Claims (Docket Entry No. 34) and Defendant's Motion For Summary Judgment As Pertains to John Todd and Annette Kalinowski  (Docket Entry No. 37), to which the Plaintiffs responded in opposition.

Plaintiffs Nancy Bullard  ("Bullard"), Annette Kalinowski ("Kalinowski") and John Todd ("Todd") were previously employed by the Fort Campbell Federal Credit Union ("Defendant" or "credit union").   They initially filed suit against the Defendant in the Chancery Court of Montgomery County, Tennessee on August 17, 2006, alleging claims under the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq.*  They filed an Amended Complaint in state court on October 18, 2006.  (Docket Entry No. 1.)  Plaintiffs alleged that Bullard is a Kentucky citizen and Kalinowski and Todd are Tennessee citizens.  The Defendant is a federally-insured credit union with its principal place of business in Clarksville, Tennessee.   Bullard was a Vice President in Administration and Human Resources, Kalinowski was a Vice President in Marketing and Business Development, and Todd was a Vice President in Information Technology.  Bullard and Kalinowski

1

are females and thus are members of a protected class. Plaintiffs alleged that, after a change in Defendant's senior management, Bullard and Kalinowski began to suffer sexual harassment in the workplace. Bullard filed a grievance concerning this treatment and she was openly supported in her effort by Kalinowski and Todd. Ultimately, Defendant terminated the employment of each Plaintiff. Under Title VII and state law, Bullard and Kalinowski asserted claims for gender discrimination and retaliation, and Todd asserted a claim for retaliation arising from his support of the female Plaintiffs. All Plaintiffs seek compensatory damages, front pay, back pay, benefits, and attorney's fees and costs. On December 5, 2006, Defendant removed the action to federal court. Defendant now moves for summary judgment on the claims of each Plaintiff.

## I. FACTS

Defendant hired Bullard as a secretary in 1991. Bullard took the title Executive Secretary in 1992 and held that position until September 2000 when Defendant's Chief Executive Officer ("CEO"), John Moorhead, promoted her to "Resources Manager." Shortly thereafter, Moorhead promoted Bullard to Vice President of Administration, a position that included, among other duties, responsibility for human resources and personnel functions.

Kalinowski was first hired at the credit union in early 1994 as member services manager. During a restructure in 1999, her title was changed to branch operations manager. In 2003 she was promoted to Vice President of Marketing and Business Development.

Todd was hired at the credit union on February 6, 1989, as data processing manager. Although his title changed to Vice President of Information Technology, his job and supervisory responsibilities essentially stayed the same through the years, but expanded to include changes in technology.

2

Moorhead retired in July 2005. That month the Defendant hired a new CEO, Tom Kane. Both Bullard and Kalinowski applied for the CEO position. Bullard was interviewed by Defendant's Board of Directors ("the Board"), but she was not chosen. Kalinowski went through two steps of the application procedure, but she was not interviewed by the Board. Kalinowski testified that, months before the CEO position was posted while Moorhead was still CEO, Board member Bobby Shreve said directly to her that a woman would never be the CEO of the credit union. Kalinowski dismissed the comment and did not find it offensive, "given the source." (Docket Entry No. 44-2, Kalinowski Depo. at 156-158.) At the time Defendant hired Kane, the Board directed Kane to evaluate the effectiveness and cost efficiency of the credit union's operations and recommend and/or implement needed changes.

Before Moorhead retired, Bullard requested that the credit union hire a Human Resources Manager and transfer most of the everyday human resources duties, such as reviewing employment applications, testing applicants, and handling payroll, from Bullard to the new manager. In August 2005, after Kane arrived, this was accomplished. Bullard retained some human resources duties. Kane also transferred certain accounting functions from Bullard to the accounting department, a change Bullard welcomed.

Shortly after taking over as CEO, Kane used the f-word in front of male and female employees during business and office-related meetings attended by the Plaintiffs and on at least one occasion when an outside vendor was present at a meeting. Kane used the term as a curse word. Kalinowski testified that Kane used the f-word frequently in the very beginning and after the first couple of weekly executive meetings, she could not think of a meeting when Kane did not use the

3

f-word at some point.   (Docket Entry No. 37-2, Kalinowski Depo. at 31.)  Bullard and Kalinowski

found Kane's use of the f-word sexually offensive, regardless of the context.

Todd testified that he heard Kane use the f-word three or four times in frustration and not

in a sexual way towards an employee.  (Docket Entry No. 37-1, Todd Depo. at 98, 106-107.)  Todd

was not personally offended by use of the f-word among a group of men, but if his wife or women

were  present, the term  offended him.  He never heard Bullard or Kalinowski use the f-word.  (Id.

at 99-100.)

Following the meeting with the vendor at which Kane used the curse word, Kalinowski

expressly asked Kane during a private conversation not to continue to use the word in business

settings.  Kane told her to get used to it.  On another occasion thereafter, Kalinowski verbally asked

Kane not to use the f-word.  She also put her request in writing.  (Kalinowski Depo. at 30, 39.)

On another occasion, during an executive meeting, Kane asked if anyone wanted something

from the galley.  A male staff member spoke up and said he would like to have a beer.  Kane replied

that he was glad the staff member had the "stones" to ask for a beer.  To Bullard, the term "stones"

referred to male genitals, and the term was offensive to her.  Bullard and Kalinowski were also

offended because Kane tried to "french kiss" the ear of David Wilhelm in front of all the staff during

a meeting.  According to Bullard, the credit union performed annual sexual harassment training for

its employees, but to her knowledge, Kane did not attend any training on sexual harassment.

In August 2005, after Kalinowski had approached Kane at least twice about his language,

Kalinowski attended a luncheon meeting with Kane and two other individuals.  In the midst of

conversation, Kane leaned across the table and said, "I don't need you anymore.  You're fired."

When Kane and Kalinowski got in the car to leave the restaurant, Kalinowski told Kane that his

4

statement made her feel uncomfortable. Kane laughed and told her to get used to it. He was not joking, and he gave no explanation for his behavior. (Kalinowski Depo. at 115-116.)

On September 12, 2005, Bullard filed an internal grievance against Kane concerning events that occurred in August, alleging, among other things, Kane's use of offensive language and an alleged act of retaliation against her. As to retaliation, Bullard referenced an executive meeting during which Kane stated that if any executive had issues with another executive, those issues would be discussed openly in an executive meeting. However, as Bullard exited a restroom, she overheard vice presidents JoAnn Dunn and Patty Spencer speaking loudly with Kane about Todd and how he did not give technical computer support to them. Bullard asked Kane about the previous discussion in the executive meeting and commented that she had now observed the very thing the executives had agreed they would stop doing. Kane stated that Bullard was correct. However, at the end of that week, Bullard and Kane had another conversation during which Kane directed Bullard to move her office from the executive suite to a smaller office in a more undesirable location in the building and to take the Executive Secretary with her. Patty Spencer, Vice President of Lending, would take Bullard's office in the executive suite. Bullard believed that this move was unnecessary because there was a vacant office in the executive suite that Spencer could have used.

In the smaller office in the far corner of the more undesireable location of the building, Bullard could not see or be seen by anyone entering or exiting the area. The newly-hired male Human Resources Manager, Bill McNutt, was given the larger executive office near Bullard. McNutt spoke with Kane and offered to move into the smaller office so Bullard could have the executive office, but Kane told him he would not discuss it and Bullard would occupy the office he told her to occupy. Kane communicated with McNutt, but refused to communicate with Bullard

5

about human resources issues.[1] According to Bullard, Kane told her that she would have to spend some time in purgatory and asked her if she knew what purgatory was. Kane told Bullard he was a Catholic and explained purgatory to her.

Todd thought Kane harassed Bullard because she was female and Kane "power[ed] over her" in various ways, including making her move to a smaller office. (Id. at 108.) Todd testified that, prior to the hearing on Bullard's grievance, Kane entered Todd's office and shut the door. No one was present but Kane and Todd. Kane told Todd that the Board's HR Committee would be investigating Bullard's grievance and that Todd may be called to give a statement. Kane told Todd to "choose his side" and not to discuss the matter with anyone. (Todd Depo. at 83-84.)

Kalinowski testified that Kane also visited her office, told her about Bullard's grievance, and asked her to share information about Bullard's complaints. (Kalinowski Depo. at 108.) She told Kane it was inappropriate for him to discuss Bullard's grievance matter with her and she was uncomfortable. Kane told her that she had to decide what her role was going to be in the future and "to fly low and steer clear and [she'd] be okay." (Id. at 109.) She asked if he was threatening her and he said, "take it however you would like to." (Id. at 108.) The next morning Kalinowski wrote a letter to Kane, took it to his office, and offered to stay to discuss it. Kane told her that would not be necessary. She was not sure whether Kane read the letter. (Id. at 109.) Thereafter Kane's allegedly retaliatory acts escalated. Kalinowski also filed a grievance in November 2005. (Id. at 115.) After the grievances, Kane's alleged retaliation continued to escalate. Kalinowski felt she was cut off from communication and Kane treated her differently by taking away her authority. She felt that Kane retaliated against the executive staff who brought to his attention things that he was doing

_____

[1]McNutt was employed less than a year and resigned his employment as of March 31, 2006.

6

that could adversely affect that person or the credit union. Kane separated the executive staff so that they were afraid to talk to each other. (Id. at 54, 150-151, 164-165.)

Bullard's grievance was heard by the Human Resources Committee of the Board, comprised of two Board members, John Hunt and William Forrester. At the hearing, which was supposed to be an unbiased review process, Forrester stated that he was 100% behind Kane and that he felt many of the board members were. (Docket Entry No. 44-1, Kalinowski Aff. ¶ 8.) He further stated that odds were that "they will be gone in December" before Kane and he would take it on his own to push for this effort. The Board was notified in writing and provided with a tape recording and transcript of Forrester's remarks, but on December 12, 2005, the Board determined that his statements had no bearing on their actions. (Id.)

Bullard and Kane were present at the grievance hearing to listen to each other's testimony. Other witnesses testified, including Kalinowski and Todd, and all testimony was taken down by a court reporter. During the hearing, Kalinowski told the Board and Kane that Kane's use of the f-word offended her. She said it again during her own grievance hearing. All told, Kalinowski counted five times that she confronted Kane about his offensive language. (Kalinowski Depo. at 39.) Kane admitted to the Committee that he had a habit of cursing. He apologized directly to Bullard and agreed to issue an apology to all other management staff. The Committee accepted his apology and instructed him to refrain "from this inappropriate and unprofessional behavior." (Docket Entry No. 36-4, Bullard Ex. 16 at 2.) The Committee further stated in its written report that Kane's cursing behavior was not compatible with the qualities of a CEO, it would not be tolerated, and the issue would be monitored and discussed during Kane's annual performance evaluation. (Id.)

7

Kalinowski testified that she heard Kane use the f-word at least one time after Bullard's grievance was heard. (Kalinowski Depo. at 33, 153.)

In resolving the retaliation issue raised by Bullard, the Committee relied on Kane's testimony that he had previously planned to relocate Patty Spencer from the first floor to the executive suite. Kane considered it more important to have his operations management staff in close proximity to his office than the administrative staff. The Committee accepted that Kane had a different management style and philosophy than John Moorhead, found no fault on the part of Kane, and dismissed Bullard's grievance on the retaliation issue. The Committee did not find any merit in other issues Bullard raised, such as Kane's personal bias, his denial of funds to send Bullard to a CEO institute, and his actions in setting up a situation to "trap" Bullard. As to the "entrapment" issue, Kane told Bullard that she had failed one of his "tests" and that if she failed another one, she would not work for him. Bullard asserted that she had serious trust issues as a result of the incident and could not be sure at any time whether she was undergoing another of Kane's "tests." Bullard claimed that Kane had created a hostile work environment, and Bullard found herself questioning everything she did or said, which impacted her ability to perform her job. The Committee determined that this issue did not constitute a grievance and dismissed it. The Board adopted the Committee's recommendation.

Other than raising the issue of Kane's offensive cursing, Bullard did not expressly formulate any of her other concerns about Kane as harassment based on sex or gender. She stated generally that Kane had created a "hostile work environment." (Id.) Bullard argues that her statements should be viewed in the context in which they were made by her as a layperson and not a lawyer.

8

Two months later, on November 4, 2005, Bullard filed a charge of discrimination with the Tennessee Human Rights Commission ("THRC"). She checked the boxes to allege gender, religious, and age discrimination and retaliation. She checked boxes to assert that she was subjected to harassment, retaliation/reprisal, and intimidation, and had been threatened with termination. In response to the question, "What reason did the employer . . .give for the action(s) taken against you?" Bullard wrote, "Because I must spend a couple of years in purgatory because of how other executives feel about me and because I failed his test." (Docket Entry No. 36-4, Bullard Ex. 19 at 2.) Bullard stated the discrimination began approximately August 18, 2005 and continued to the date of filing. She indicated she sought assistance from the Board's Human Resources Committee and attached the written report issued following her grievance hearing. (Id.) In the narrative statement she provided in support of her THRC charge, Bullard complained about various interactions she had with Kane and her isolation at the credit union, which had grown progressively worse since she filed and lost the grievance against Kane. Bullard now claims that she did raise sexual harassment in her THRC charge, she did not have a lawyer, and the substance of her charge was completed by an intake officer at the agency.

On April 12, 2006, Bullard filed an administrative charge with the EEOC complaining of sex and age discrimination on June 21, 2005, due to the Board's failure to hire her as CEO when she had greater qualifications that Kane. Bullard stated that she was 51 years old and Kane was 45 years old. She alleged that Kane discriminated against her on the basis of gender because Kane refused to meet with her without the presence of a male, and he did not require the presence of another person when he met with Todd. Bullard claimed that Kane "has created a hostile work environment and is trying to force me to resign my employment." (Docket Entry No. 36-4, Bullard Ex. 24.)

9

In Todd's view, Kane did not like Bullard because she was a female and because he was worried that she was quite capable and knowledgeable concerning her job. (Todd Depo. at 109.) Todd testified during Bullard's grievance hearing that he supported Bullard, she was being treated unfairly by Kane, and he did not consider Kane to be a leader or a manager. (Id. at 41.) Forrester responded in so many words or implied that Todd did not know what he was talking about and that the people raising the problems were going to be taken care of. Forrester definitely let Todd know that nothing was going to happen from the hearing and not to expect anything. (Id. at 41-42.) Todd also testified that he was supportive of Bullard during an August 29, 2005 meeting of the executive staff with an outside vendor when JoAnn Dunn, another credit union vice president, launched a tirade against Bullard and Kane just sat back and grinned. Todd also quizzed Kane about why Bullard was required to move her office when Todd could see no reason for moving people around and he made known to Kane that he did not agree with moving Bullard's office. (Id. at 39-40, 54, 56, 82, 112.) Todd knew that Kalinowski was also having difficulty with Kane, particularly that he would not open her emails. Kalinowski and members of the Board asked Todd if there was some way to tell whether emails were opened and read and not show up as read on the computer system. Todd told Kalinowski that he would need to run some tests on Kane's laptop, but it was never forwarded to him to test. (Id. 87-88.) Shortly after Kane took over as CEO, the executive staff and their spouses went on a dinner cruise. Kane did not want to sit with Todd and his spouse, Bullard and her spouse, and Kalinowski and her spouse, saying, "I get stuck with the bad table." (Id. at 116-117.) While this could have been a joke, Todd was not sure that it was. (Id. at 117.) Kane got upset during the cruise because his wife carried on a conversation with Kalinowski. Kane told his wife not to speak to Kalinowski. (Id.)

10

Kalinowski testified that Kane was demeaning and discriminatory. He treated women who "were confident and professional differently than he treated the men at the credit union or that he treated women [who] would say yes to whatever he said." (Kalinowski Depo. at 38.) Kane never told Kalinowski that her marketing performance was lacking, and she conducted measurements after each marketing program to judge the success of her department. (Id. at 99.) Kane had begun excluding Kalinowski from executive communications and making presentations to the Board about marketing issues very early on. (Id. at 45-46.) After grievances were filed, Kalinowski was not permitted to return to a Board meeting for months. (Id. at 53-54.) When Kalinowski questioned why she was not included, Kane told her, "I decide who participates in meetings and you're not on that team." (Id. at 47.) Kane met with Spencer, Dunn and McKee frequently, but excluded Kalinowski, Bullard, and Todd. (Id. at 51.)

At the end of May 2006, Kane met with the Board and presented a reorganization plan which eliminated the positions of Bullard, Kalinowski and Todd. Board member Tom Denney moved to approve the plan and William Forrester seconded the motion. Immediately following the recommendation and unanimous approval (with one abstention) to accept the plan, the Board took a break in the mid- to late-afternoon.

Within thirty minutes of the break, Kane called Todd into his office and terminated his employment effective immediately. (Todd Depo. at 13.) Todd had no idea that he was going to be fired. Kane told him that the Board had just approved his reorganization plan and there was no place for Todd in his future credit union and he was letting Todd go immediately. Kane asked Todd for any credit union property and told him he could schedule an appointment to come back and get his personal belongings. Todd was escorted off the premises. When justifying Todd's dismissal to the

11

State, Kane reported that the firing was due to Todd's job performance and his failure to comply with Service Star standards. Todd contends neither reason was a valid reason to terminate his employment. (Id. at 17, 38-39.) He asserts that he was fired for supporting Bullard and Kalinowski in their grievances against Kane.

Kalinowski was contacted by telephone and told to return to the office. When she did so, Kane also terminated her employment, effective immediately. Kalinowski asked what type of severance package was being put together because she had worked for the credit union nearly fourteen years and Kane told her the termination was not performance-related. Kane's answer was that the Board did not approve a severance plan. Kalinowski was immediately escorted off the premises and told she could return at a later date during non-business hours accompanied by Kane to collect her personal items (only those for which she presented a receipt). (Kalinowski Depo at 130.)

Bullard was on medical leave at the time and received a June 1, 2006 letter from Kane informing her that her employment was terminated effective Wednesday, May 31, 2006.

Some of Bullard's duties were absorbed by the female Vice President of Operations, Maria McKee, and the female Assistant Vice President of Operations, Melody Swindall. The credit union hired a facilities manager and created a new position to handle the security duties for which Bullard had been responsible. Kalinowski's marketing duties were outsourced to another company. A new position was created, Membership Development Coordinator or Director, to oversee the marketing efforts. Her branch operations responsibilities were given to the recently-created position of Assistant Vice President of Operations. Todd's position was filled at the managerial level to take over the technology duties and Todd's Vice President duties were taken over by the new Information

12

Technology department manager. Todd was not offered the opportunity to take the manager's position and receive his Vice President pay for one year from the date of the change, as provided in the credit union's personnel policy section 3050. (Docket Entry No. 36-2, Personnel Policy Manual.) The Plaintiffs claim their employment was terminated as a result of Kane's retaliation and not due to any need for reorganization.

Defendant denies that the changes Kane made at the credit union at any time during his tenure were discriminatory or retaliatory. Defendant takes the position that all changes were undertaken to create efficiencies, save money, and increase the credit union's net income.

The THRC found no reasonable cause to find that Defendant had engaged in a discriminatory practice and dismissed the Plaintiffs' administrative complaints on May 11, 2006. The EEOC adopted the THRC's findings on May 31, 2006, and then issued right-to-sue letters. This appears to be the same day that Kane terminated the employment of Bullard, Kalinowski and Todd. On June 5, 2006, Bullard filed another EEOC charge alleging that her firing was retaliatory.

This lawsuit followed. Bullard and Kalinowski abandoned their claims of disparate treatment based on gender; Kalinowski also abandoned her sexual harassment claim. Plaintiffs assert that evidence of sex discrimination and harassment is part of the background evidence necessary to show Defendant's retaliation.

Kane left the credit union May 18, 2007. (Docket Entry No. 37-4, Kane Decl. ¶ 2.) Maria McKee assumed the duties of CEO.

## II. **STANDARD OF REVIEW**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See

Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. ANALYSIS

### A. Bullard's hostile work environment claim

A hostile work environment exists if the workplace is permeated with sexually discriminatory intimidation, ridicule and insult that is sufficiently severe and pervasive to alter the conditions of the plaintiff's employment, and if an objectively reasonable person would view, and

14

the plaintiff herself did view, the environment as abusive.  See <u>Oncale v. Sundowner Offshore</u> <u>Servs., Inc.</u>, 523 U.S. 75, 78, 81 (1998); <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21-22 (1993).

To establish a prima facie case of a hostile work environment, a plaintiff must show five elements: (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment had the effect of unreasonably interfering with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability.  <u>Hafford v. Seidner</u>, 183 F.3d 506, 512 (6th Cir. 1999).  Whether a work environment is sexually hostile or abusive can be determined only by looking at all of the circumstances.  <u>Harris</u>, 510 U.S. at 23.  Here, the Plaintiff perceived the work environment as sexually hostile, but the sexual harassment alleged was not so severe and pervasive as to require jury trial on the issue.  See <u>Oncale v. Sundowner Offshore Servs.</u>, 523 U.S. 75, 81 (1998); <u>Bowman v. Shawnee State Univ.</u>, 220 F.3d 456, 463 (6th Cir. 2000).

Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at intentional discrimination based on a protected category, such as sex.  See <u>Oncale</u>, 523 U.S. at 80; <u>Morris v. Oldham County Fiscal Court</u>, 201 F.3d 784, 790 (6th Cir. 2000).  The critical issue is "'whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" <u>Id.</u> (quoting <u>Harris</u>, 510 U.S. at 25)).  The inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by the individual.  <u>Oncale</u>, 523 U.S. at 81.  In determining whether the alleged harassment was sufficiently severe and pervasive, the Court must consider the totality of the circumstances.  <u>Williams v. General Motors Corp</u>, 187 F.3d 553, 562 (6th Cir. 1999).  The Court must take into account the frequency of the discriminatory conduct; its severity; whether it is

15

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Harris, 510 U.S. at 23. Moreover, personal conflict "does not equate with discriminatory animus." Morris, 201 F.3d at 791; Barnett v. Department of Veterans Affairs, 153 F.3d 338, 342-343 (6th Cir. 1998).

Kane's use of the f-word was certainly inappropriate in a professional business setting. Before Bullard's grievance hearing, Kane used the f-word before men and women. He tried to "french kiss" Wilhelm's ear before men and women. He made the comment about "stones" before men and women. There is no evidence that Kane used any other profane words, or that he inappropriately touched Plaintiff in a sexual manner.

These incidents were improper, and Plaintiff filed a grievance about them. The Board held a hearing on Plaintiff's grievance. Kane admitted that he acted inappropriately, he apologized, and his superiors chastised him for his conduct and directed him to stop it. There is very limited evidence that, after the grievance hearing, Kane ever again used the f-word at the office. Kalinowski could recall one time when Kane used the f-word after he was told not to. Offhand comments or isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. In re Rodriguez, 487 F.3d 1001, 1010 (6th Cir. 2007) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

Under the totality of the circumstances, the Court concludes that Plaintiff has not shown that a reasonable person could find that the work environment was severely and pervasively permeated with sexually discriminatory intimidation, ridicule, and insult after Kane was told to stop using the f-word. See Oncale, 523 U.S. at 81; Harris, 510 U.S. at 21-22. Consequently, the Court concludes that Bullard's claim of a sexually hostile work environment must fail.

16

### B. Retaliation claims of all Plaintiffs

To establish a retaliation claim, a plaintiff must show that (1) he or she engaged in protected activity, (2) the employer knew of the protected activity, (3) the employer thereafter took adverse employment action against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action. Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007). Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to produce a legitimate, non-retaliatory reason for the adverse action taken against the plaintiff. Randolph v. Ohio Dept. of Youth Servs., 453 F.3d 724, 737 n.4 (6th Cir. 2006). The burden then shifts back to the plaintiff to establish that the reason proffered by the defendant was merely pretextual and that the actual reason was retaliation for engaging in protected activity. Id.

Bullard and Kalinowski complained of a sexually hostile work environment by filing grievances that were heard by the Board and by filing THRC and EEOC charges. Todd supported Bullard and Kalinowski in their complaints. The Defendant was aware of this protected activity. Plaintiffs have presented direct evidence of Kane's retaliation against them, as well as additional circumstantial evidence of retaliation. They have satisfied the *prima facie* case.

Defendant counters that Kane had legitimate business reasons for all of his actions, including the reorganization that cost the Plaintiffs their livelihoods. Yet, Plaintiffs have produced sufficient evidence of pretext to deserve a jury trial. Kane's own statements to the Plaintiffs evidence his retaliatory motive, and other evidence in the record would support a reasonable finding by the factfinder that Kane's reorganization plan was a pretext for his desire to fire the Plaintiffs out of retaliation for their complaints about him to the Board. See Michael v. Caterpillar Financial Servs. Corp., 496 F.3d 584, 597 (6th Cir. 2007). Because genuine issues of material fact remain for trial

17

on retaliation, the Court will deny Defendant's motion for summary judgment on the retaliation claims of all three Plaintiffs.

## IV.  CONCLUSION

For all of the reasons stated,  Defendant's Motion For Summary Judgment As To Plaintiff Nancy Bullard's Claims (Docket Entry No. 34) and Defendant's Motion For Summary Judgment As Pertains to John Todd and Annette Kalinowski  (Docket Entry No. 37), will be GRANTED IN PART and DENIED IN PART as stated in this Memorandum.

An appropriate Order shall be entered.

_____

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE